UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIGUEL ANGEL VILLEGAS,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>J. W. SULLIVAN,<br><br>　　　　Respondent. | Case No.　1:19-cv-00668-NONE-JDP (HC)<br><br>FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR A WRIT OF HABEAS CORPUS AND TO DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY<br><br>OBJECTIONS DUE WITHIN 30 DAYS<br><br>ECF No. 1 |

　　　　Petitioner Miguel Angel Villegas, a state prisoner without counsel, seeks a writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 1. Petitioner claims: (1) that there was insufficient evidence to support his convictions; and that the trial court (2) gave erroneous jury instructions, (3) wrongfully denied his motion to bifurcate, (4) wrongfully denied his motion for a new trial, and (5) wrongfully denied his motion for juror discovery. *Id*. The California Court of Appeal rejected all claims on the merits in a reasoned decision, and the California Supreme Court summarily denied all claims on collateral review. For the reasons set forth below, we recommend that the court deny the petition and decline to issue a certificate of appealability.

**I.　Background**

　　　　In 2015, a jury sitting in Tulare County convicted petitioner of attempted robbery and conspiracy to commit robbery, and applied firearm and criminal street gang enhancements. *See People v. Villegas*, No. F072155, 2018 Cal. App. Unpub. LEXIS 165, at *2 (Jan. 10, 2018).

Petitioner received an aggregate prison sentence of 12 years.  *Id*.  We set forth below the pertinent facts of the underlying offenses, as summarized by the California Court of Appeal.  A presumption of correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

> **Introduction**
>
> This matter involves three defendants, [petitioner] Miguel Angel Villegas, Gustavo Jesus Mendoza, and Joel Serrato (collectively the Codefendants).
>
> **I. The Undercover Drug Purchase**
>
> In January 2014, law enforcement planned an undercover operation to purchase OxyContin illegally from a seller, Ronald Ditlevson, Jr.  Shawn Riley, an agent from the Drug Enforcement Administration (DEA), had purchased OxyContin illegally from Ditlevson on three previous occasions starting in October 2013.  Riley had paid Ditlevson in cash during the three prior transactions.  In setting up a fourth purchase, Riley hoped to learn the identity of Ditlevson's supplier.  Prior to this fourth purchase, nothing indicated that Ditlevson had any connection with a criminal street gang.
>
> **A. The negotiations for the fourth drug purchase**
>
> Riley began negotiating with Ditlevson for a fourth purchase of OxyContin.  In a series of communications, Ditlevson said he was having trouble obtaining the drug.  They eventually agreed on a sale date of January 30, 2014.  Riley agreed to pay $2,600 for the pills.
>
> At around 3:15 p.m. on the day of the planned purchase, Ditlevson texted Riley, indicating he did not yet have the pills and he asked for the money up front.  When Riley refused, Ditlevson asked for half of the money, noting he needed to meet his source to obtain the pills.  After Riley again refused, Ditlevson agreed to go ahead with the sale that day.  At about 3:19 p.m., Riley suggested that Ditlevson's supplier should meet them at the sale.  Ditlevson agreed that would happen.
>
> **B. Ditlevson contacts appellant**
>
> Shortly after confirming the sale with Riley, Ditlevson called [petitioner's] cellular telephone.  The call occurred at 3:28 p.m. and it lasted one minute and 56 seconds.  At 3:38 p.m., [petitioner] texted Ditlevson, "Can you pick me N [sic] my boy up and well [sic] do [everything].  We just need a ride."  Four additional outgoing calls were placed from Ditlevson's phone to [petitioner's] phone at 3:41 p.m., again at 3:41 p.m., 3:56 p.m., and finally at 4:02 p.m.

### C. Police officers spot [petitioner] and codefendant Mendoza at the location of the planned drug sale

Later that same day, at approximately 4:45 p.m., Riley and local officers from the Visalia Police Department took up positions at the prearranged sale location, a hotel parking lot. It was close to sundown. Two of the previous illegal drug purchases with Ditlevson had occurred in this same parking lot. Riley used the same vehicle that he had used in his three previous drug purchases with Ditlevson. While Riley waited in his vehicle in the parking lot, the police officers set up as surveillance and security teams. Riley notified Ditlevson that he was at the location.

While they waited for Ditlevson to show up, a police officer observed two males walking together in the parking lot; these males were later identified as [petitioner] and codefendant Mendoza. They passed near an unmarked police vehicle that was providing surveillance of the anticipated drug purchase. [Petitioner] and Mendoza made eye contact with one of the undercover officers. They walked away and then they returned about a minute or two later. The officer did not see either of them carrying a gun. Based on their body language, the officer believed that appellant and Mendoza had realized that undercover officers were in the area.

### D. Ditlevson moves the location of the planned drug sale

At approximately 5:03 p.m. that same day, Ditlevson texted Riley that "his source of supply" had told him that police "train in that area[.]" Ditlevson wanted to move the sale location to a nearby park. Riley tried to get Ditlevson to come to his location, indicating no police were present, but Ditlevson remained adamant that he wanted to change locations. Riley, after consulting with his teams, agreed to switch the location for the drug purchase. Riley never saw Ditlevson at the hotel parking lot and nobody approached Riley while he was there.

Riley and the police teams relocated to the nearby park. The other police officers took positions to provide security and surveillance. Everyone was ready at about 5:30 p.m. Riley parked his vehicle near the park's exit.

### E. [Petitioner] and Mendoza approach Riley at the new location

Less than a minute after Riley parked at the new location, [petitioner] and Mendoza began walking together in tandem across a grassy area towards Riley. They were initially spotted about 30 yards from Riley's position. As they came closer, they both made eye contact with Riley. [Petitioner] had a beanie or a bandanna on his head. Mendoza had his face covered up to the bridge of his nose with some type of white cloth. Mendoza wore a long-sleeved sweatshirt, or something similar, and he walked with his right hand tucked underneath his opposite armpit, making it appear that he carried a weapon.

3

Riley had never seen [petitioner] and Mendoza before. Although Riley did not see a gun, he became nervous and feared for his safety. [Petitioner] and Mendoza came within about 10 to 15 yards of Riley. Riley believed they were armed and they were approaching to rob him. Riley drove away.

Neither [petitioner] nor Mendoza said anything to Riley, and neither pointed a weapon at him. As Riley drove away, neither [petitioner] nor Mendoza yelled anything towards him, they did not run towards his vehicle, and they did not try to stop him. Neither [petitioner] nor Mendoza chased after Riley, but they did stop and watch him leave the park.

After Riley drove away, an officer providing surveillance saw that Mendoza had a shiny metal object in his hand underneath his left arm near his "armpit area." Upon closer inspection, the officer saw "no more than an inch" of a gun's barrel there. The officer determined that Mendoza had a firearm. [Petitioner] and Mendoza walked to Ditlevson's parked vehicle, entered it and drove away. At trial, Riley confirmed that he never spotted Ditlevson's vehicle after the proposed sale was relocated to the park.

### F. Law enforcement detain four suspects

Undercover officers followed Ditlevson's vehicle as it drove away from the park. It left the City of Visalia and entered the City of Exeter. Police took four occupants into custody: Ditlevson had been driving; codefendant Serrato was the front passenger; [petitioner] and Mendoza were rear passengers. No illegal narcotics were located. Police located and seized a loaded .45-caliber handgun inside the vehicle. The gun had been lying behind the back seat on the floor under a towel or T-shirt. Officers recovered two rounds of .45-caliber ammunition in the vehicle's center console between the driver's seat and the passenger's seat.

At trial, one of the police officers testified that the barrel of the recovered handgun had a "consistent shape" with the barrel of the handgun seen on Mendoza after Riley fled.

### G. Mendoza and Serrato make statements to the police

Police interviewed Serrato, who stated he had been at Mendoza's house. He also said he had been with Ditlevson in Visalia on January 30, 2014. He claimed to have been meeting a female, but he did not know her name. He indicated that he had gone near the hotel. Serrato admitted that he was an active gang member and he had observed a handgun in Ditlevson's vehicle.

Police interviewed Mendoza, who said Ditlevson picked him up sometime in the evening of January 30, 2014. Mendoza, however, denied that he went to the hotel. During his police interview, Riley walked into the room and Mendoza's shoulders dropped, and his head bowed. Mendoza denied that he had a gun.

4

**II. The Relevant Gang Evidence**

The parties stipulated that the Norteños are a criminal street gang within the meaning of section 186.22. Additionally, Serrato and Mendoza both stipulated that they are active Norteño gang members, and they both stipulated that they are prohibited from owning or possessing a firearm.

The prosecution's gang expert provided background about the Norteño gang, its rivals, its structure, and how it pays taxes within its hierarchy. The expert reviewed photographs taken from [petitioner's] cellular telephone that showed [petitioner] in various poses and attire that the expert attributed to the Norteño gang. [Petitioner] had a photograph of Mendoza, and he had different photographs of himself with Mendoza and Serrato. The expert explained how law enforcement classifies someone as a gang member. The expert opined that appellant was a Norteño gang member.

The gang expert confirmed that Ditlevson was not a "northern" gang member. The expert noted that Norteños do not usually commit crimes with people not associated with the gang. In such a situation, the gang members would leave a "watchdog" to ensure that the non-member did not leave while the crime was underway. The expert also believed a second gang member would accompany the primary robber to provide protection and to vouch for the crime. The gang members would all work together in different roles.

The gang expert opined that gang members who get money as a result of committing a crime owe a portion of the proceeds to the gang. The expert opined that the Norteño gang tries to control the sale of drugs in Visalia. The gang might allow a non-Norteño to sell drugs in Visalia if the gang was paid. The expert admitted, however, that there was no evidence that Ditlevson was paying anyone. He also admitted that there was no evidence that the Codefendants had orders from the gang to commit this crime.

*Villegas*, No. F072155, at *2-9.

**II.   Discussion**

   **A.   Standard of Review**

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See Harrington v. Richter*, 562 U.S. 86, 97 (2011). To decide a § 2254 petition, a federal court examines the decision of the last state court that issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*,

138 S. Ct. 1188, 1192 (2018). We must defer to that decision, and cannot grant habeas relief for any claim that was adjudicated on the merits in the state proceeding unless it was contrary to clearly established federal law or based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

If obtaining habeas relief under § 2254 is difficult, "that is because it was meant to be." *Richter*, 562 U.S. at 102. As the Supreme Court has put it, federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Id*. at 103 (citation omitted). Our habeas review authority serves as a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id*. at 102-03 (emphasis added).

This court applies the deferential standard of § 2254 to the last reasoned opinion in this case—here, that of the Court of Appeal.

**B.     Sufficiency of Evidence**

Petitioner claims that there was insufficient evidence to support his convictions. ECF No. 1 at 14. The Court of Appeal rejected petitioner's claim, finding the evidence sufficient.[1] ECF No. 19-1 at 10-15.

To gain relief, petitioner must prove that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt" based on the evidence presented at trial. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319. If the record supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id*. at 326; *see Cavazos v. Smith,* 132 S. Ct. 2, 4 (2011) ("[I]t is the responsibility of

---

[1] The Court of Appeal found that petitioner waived his claim of insufficient evidence on the conspiracy charge, but nevertheless reviewed the claim on the merits. ECF No. 19-1 at 9. We will do the same here.

6

1   the jury—not the court—to decide what conclusions should be drawn from evidence admitted at
2   trial.")  Moreover, an additional layer of deference under AEDPA applies to a review of an
3   insufficient evidence claim: habeas relief is not warranted unless "the state court's application of
4   the *Jackson* standard [was] objectively unreasonable." *Juan H. v. Allen*, 408 F.3d 1262, 1274,
5   1275 n.13 (9th Cir. 2005).

6         We look to state law to determine what evidence is necessary to sustain petitioner's
7   convictions. *See Jackson*, 443 U.S. at 324 n.16.  "A conviction of conspiracy requires proof that
8   the defendant and another person had the specific intent to agree or conspire to commit an
9   offense, as well as the specific intent to commit the elements of that offense, together with proof
10  of the commission of an overt act by one or more of the parties to such agreement in furtherance
11  of the conspiracy." *People v. Morante*, 20 Cal. 4th 403, 416 (1999).  Circumstantial evidence
12  may be used to establish the elements of conspiracy. *People v. Bogan*, 52 Cal. App. 4th 1070,
13  1074 (2007).  The conduct, relationships, and activities of the alleged conspirators before and
14  during the alleged conspiracy may be considered. *Id*.  Robbery is "the felonious taking of
15  personal property in the possession of another, from his person or immediate presence, and
16  against his will, accomplished by means of force or fear." Cal. Pen. Code. § 211.  Attempted
17  robbery occurs when there is "(1) the specific intent to commit robbery" and (2) a "direct but
18  ineffectual act done toward its commission." *People v. Watkins*, 55 Cal. 4th 999, 1018
19  (2012).  The act must represent "some appreciable fragment of the crime," *id*. at 1021, but there is
20  no requirement that an element of robbery be committed, *People v. Lindberg*, 45 Cal. 4th 1, 28
21  (2008).

22        Here, a reasonable juror could conclude that petitioner planned to participate in a robbery
23  of Riley with his co-defendants and took at least one direct act towards its commission.  The jury
24  was presented with evidence that an undercover officer had purchased drugs from Ditlevson on
25  three previous occasions.  ECF No. 20-7 at 51.  Ditlevson and the undercover officer texted
26  extensively about the price of the drugs.  *Id*. at 58-61.  Ditlevson asked the undercover officer to
27  give him half of the money for the drugs prior to the planned exchange.  *Id*. at 141.  On the day of
28  the incident, Ditlevson called petitioner once and petitioner called Ditlevson five times.  *Id*. at

142-43. Hours before the incident, petitioner texted Ditlevson, stating "Can you pick me N my boy up and well do everything. We just need a ride." *Id*. at 143. Petitioner was with all his co-defendants before the incident. *Id*. at 175-76. Petitioner was observed by multiple detectives at both the Holiday Inn and Adventure Park, locations where Ditlevson planned to meet Riley. *Id*. at 168-69. Petitioner and Mendoza were observed walking in tandem toward Riley and making eye contact with Riley. *Id*. at 73-78. Mendoza covered his face and held a shiny metal object that at least one detective identified as a gun; another detective testified that petitioner covered his face with a bandana. *Id*. at 73-78; 221; ECF No. 20-8 at 20. Riley's observations led him to be concerned for his safety, believing petitioner and Mendoza were going to rob him. ECF No. 20-7 at 134. After Riley fled, petitioner and Mendoza got into Ditlevson's car, where police officers later found a loaded gun and additional ammunition. ECF No. 20-7 at 174-75. Three officers searched for drugs in the car but found none. ECF No. 20-7 at 129; 173-75; 207. One officer surmised that the lack of drugs signaled that petitioner and his co-defendants did not intend to sell drugs to Riley, but rather intended to rob Riley, who petitioner and his co-defendants believed possessed a large amount of cash. *Id*. at 229.

In sum, upon hearing that petitioner texted Divletson that he and Mendoza would "do everything," was at the scene of the planned drug purchase with his face covered, walked with Mendoza towards Riley while Mendoza held a gun, and fled the scene in Divletson's car, a "rational trier of fact could have found the essential elements" of conspiracy and attempted robbery "beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Accordingly, the Court of Appeal's finding of sufficient evidence was not contrary to or an unreasonable application of the *Jackson* standard.

### C.    **Instructional Error**

Relatedly, petitioner claims that because there was insufficient evidence to support a finding of attempted robbery, the trial court erred when it instructed the jury on attempted robbery. ECF No. 1 at 22. Referring to its finding that the evidence was sufficient to support an attempted robbery conviction, the Court of Appeal found that the trial court did not err in giving the instruction. ECF No. 19-1 at 15.

8

An "allegedly erroneous jury instruction will support a collateral attack on a judgment of conviction only where the instruction 'by itself so infected the entire trial that the resulting conviction violates due process.'" *Quigg v. Crist*, 616 F.2d 1107, 1111 (9th Cir. 1980) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). The giving of a jury instruction "does not violate due process . . . where there is evidence before the jury to support the instruction." *Id*. Because there was sufficient evidence to support petitioner's conviction of attempted robbery, there was likewise sufficient evidence to support the attempted robbery instruction. The Court of Appeal's denial of petitioner's claim was not unreasonable. Accordingly, we recommend that petitioner's claim be denied.

### D.     Bifurcation

Petitioner claims that the trial court abused its discretion when it denied petitioner's motion to bifurcate the gang enhancement from the underlying charges. ECF No. 1 at 24. The Court of Appeal found that petitioner suffered no prejudice from a failure to bifurcate the "inextricably linked" charges and the gang enhancement, considering that the evidence of petitioner's gang membership was also probative of the charged crimes. ECF No. 19-1 at 15-18.

Non-bifurcation is not a per se constitutional violation. "The Supreme Court has never held that a trial court's failure to provide separate trials on different charges implicates a defendant's right to due process." *Hollie v. Hedgpeth*, 456 F. App'x 685, 685 (9th Cir. 2011); *see Spencer v. Texas*, 385 U.S. 554, 567-68 (1967) (explaining that bifurcated jury trials "have never been compelled by [the Supreme Court] as a matter of constitutional law"). Rather, to gain federal habeas relief, the failure to bifurcate must have prejudiced the petitioner, *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991), meaning that it had a substantial and injurious effect or influence on the jury's verdict, *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2003). "In evaluating prejudice, the [federal habeas court] focuses particularly on cross-admissibility of evidence and the danger of spillover from one charge to another, especially where one charge or set of charges is weaker than another." *Id*. In other words, we evaluate whether the failure to

bifurcate allowed "evidence of other crimes to be introduced in a trial where the evidence would be otherwise inadmissible." *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).

Petitioner has not shown that non-bifurcation rendered his trial fundamentally unfair. Here, the evidence supporting the underlying crimes also supported petitioner's gang enhancement. For example, in California juries may consider the relationships and activities of members of an alleged conspiracy, *see Bogan*, 52 Cal. App. 4th at 1074, just as they may consider the relationships and activities of a defendant when determining whether to apply a gang enhancement, Cal. Pen. Code § 186.22(f). Bifurcation is unnecessary where, as here, "'evidence of a defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to the charged crime.'" *Solano v. Lewis*, NO. CV 12-7570-VAP(E), 2014 U.S. Dist. LEXIS 57544, at *27 (C.D. Cal. Apr. 19, 2014) (quoting *People v. Hernandez*, 33 Cal. 4th 1040, 1049 (2004)); *see Torrey Levarr Adams v. Hatton*, No. 2:16-cv-01029-JKS, 2018 U.S. Dist. LEXIS 197161, at *21 (Nov. 19, 2018) (denying habeas relief where much of the evidence supporting a gang enhancement was cross-admissible on the underlying charge in a non-bifurcated trial). Therefore, the Court of Appeal's denial of petitioner's claim was not unreasonable.

**E.    New Trial**

Petitioner claims that the trial court abused its discretion when it denied his motion for a new trial. ECF No. 1 at 32. The Court of Appeal denied each of petitioner's three bases for a new trial as meritless. ECF No. 19-1 at 19.

To the extent that petitioner alleges a violation of state law in the court's denial of his motion, his claim is not cognizable on federal habeas review. *See Estelle*, 502 U.S. at 67-68. Rather, to be granted relief, petitioner must show that the trial court's denial of his motion for a new trial was an independent violation of his federal constitutional rights. *See Melugin v. Hames*, 38 F.3d 1478, 1487 (9th Cir. 1994). We will consider potential federal bases of his claim.

### 1. Sufficiency of Evidence

Petitioner claims that he should have been afforded a new trial because the evidence was insufficient to support his convictions. ECF No. 1 at 33. The Court of Appeal denied this claim, referring to its previous finding of sufficient evidence. ECF No. 19-1 at 19-20. We do not find the Court of Appeal's determination unreasonable; this claim should be denied considering our findings *supra*.

### 2. Juror Misconduct

Petitioner claims that he should have been afforded a new trial due to juror misconduct. ECF No. 1 at 40. The Court of Appeal found that no bias resulted from the conduct at issue. ECF No. 19-1 at 22. During the trial, one of the jurors conversed with DEA agent Riley and a state investigator for less than 30 seconds in the courthouse parking lot. ECF No. 20-8 at 9-10. The juror asked Riley and the investigator if they knew a person who used to work at the DEA, and they answered that they did not. *Id*. The prosecution brought the interaction to the court's attention promptly, and the judge held a brief hearing, allowing defense attorneys an opportunity to raise any concerns. The judge concluded that there was no evidence of juror misconduct or bias arising from the conversation, considering that Riley and the investigator did not know the person, that the jurors had been admonished to be unbiased,[2] and that the juror in question had disclosed on *voir dire* that he had friends or family members who were law enforcement. *Id*. at 11-12. The defense attorneys did not object to the judge's finding. *Id*.

Clearly established Supreme Court precedent "compels a criminal trial court to consider the prejudicial effect of any external contact that has a 'tendency' to influence the verdict, irrespective of whether it is about the matter pending before the jury." *Tarango v. McDaniel*, 837 F.3d 936, 946 (9th Cir. 2016) (citing *Mattox v. United States*, 146 U.S. 140, 150-51 (1892)). In the Ninth Circuit, a two-part framework is employed to analyze juror misconduct: the court first inquires whether the contact was possibly prejudicial and if so, the burden is placed on the government to prove that the contact was harmless. *See Godoy v. Spearman*, 861 F. 3d 956, 959

---

[2] The court admonished the jury as follows: "do not let bias, sympathy, prejudice, or public opinion influence your decision." ECF No. 20-11 at 10.

(9th Cir. 2017). However, "if an unauthorized contact with a juror is de minimus, the defendant must show that the communication could have influenced the verdict before the burden of proof shifts to the prosecution." *Caliendo v. Warden of Calif. Men's Colony*, 365 F.3d 691, 696 (9th Cir. 2004); *see Bolden v. Davey*, No. CV 16-5105-GW (PLA), 2017 U.S. Dist. LEXIS 196279, at *27 (C.D. Cal. Mar. 29, 2017) (finding de minimus contact where juror briefly spoke to detective in courtroom and detective promptly told juror he could not talk to her).

Here, the contact was de minimus and petitioner has failed to show how the brief conversation influenced the verdict. Therefore, the burden did not shift to the prosecution to prove that the contact was harmless. Nevertheless, the prosecution brought the contact to the judge's attention and the judge held a hearing on the matter. Petitioner has failed to produce evidence that the juror held any kind of bias against petitioner, nor that he had any kind of special relationship with Riley or any other law enforcement agents involved in the case. Petitioner's counsel had the opportunity to raise any concerns before the trial judge. We cannot find that the contact between the juror and the state agents was prejudicial to petitioner. Therefore, the Court of Appeal's denial of petitioner's claim was not unreasonable and we recommend that petitioner be denied relief.

### 3. Ineffective Assistance of Counsel

Petitioner claims that he should have been afforded a new trial because his counsel was ineffective when he failed to: (1) request an evidentiary hearing on juror misconduct; (2) request an alternate juror be seated; (3) object to certain jury instructions; (4) request bifurcation of the gang enhancement; (5) and request severance of his case from his co-defendants. ECF No. 1 at 36. The Court of Appeal found all of petitioner's claims meritless.[3] ECF No. 19-1 at 23.

In federal habeas proceedings, the two-step analysis outlined by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), governs ineffective assistance of counsel claims. Petitioner first must prove that his attorney's representation fell below an objective standard of reasonableness, meaning that the attorney's performance was unreasonable under

---

[3] The Court of Appeal deemed some of petitioner's arguments waived on appeal yet addressed and rejected them on the merits. ECF No. 19-1 at 23. We will do the same.

12

1  prevailing professional norms. *Id*. at 687-88.  Review of counsel's performance is highly
2  deferential, and the petitioner must overcome the strong presumption that counsel's conduct fell
3  within the wide range of reasonable representation. *Id*. at 689.  Second, a petitioner must show
4  prejudice by demonstrating a reasonable probability that, but for counsel's error, the result of the
5  proceeding would have been different. *Id*. at 694.

6  Except for the severance claim, all of petitioner's claims underlying his ineffective
7  assistance of counsel claim have been rejected *supra*.  There is no evidence that the minimal
8  contact between the juror and the state employees negatively affected the jury's
9  deliberations.  And petitioner has failed to show that the jury instructions were erroneous or
10 unsupported by the evidence presented at trial.  Even so, petitioner's counsel objected to the
11 sufficiency of the evidence.  ECF No. 20-9 at 6.  Petitioner had no constitutional right to
12 bifurcation of the gang enhancement and bifurcation was not required under California law.  Even
13 so, and contrary to petitioner's assertion, his counsel did seek to bifurcate the gang
14 enhancements.  ECF No. 20-7 at 12.  Finally, petitioner's severance claim fails.  To be granted
15 relief, he must show that his non-severed trial was fundamentally unfair in violation of due
16 process; he has not done so. *See Sandoval v. Calderon*, 241 F.3d 765, 771-72 (9th Cir. 2000).

17 Accordingly, all of the actions petitioner claims his counsel should have taken at trial were
18 either taken by his counsel or would have been futile.  The failure to take a futile action cannot
19 support a claim of ineffective assistance of counsel. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th
20 Cir. 1999); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).  Therefore, petitioner's ineffective
21 assistance of counsel claims are without merit and should be rejected.

22 **F.    Juror Discovery Request**

23 Petitioner claims that the trial court abused its discretion when it denied petitioner's
24 motion to disclose the identity of the allegedly biased juror.  ECF No. 1 at 49.  The Court of
25 Appeal found that petitioner failed to show the good cause required under California law to
26 disclose a juror's identity.  ECF No. 19-1 at 25.  We do not find the Court of Appeal's
27 determination unreasonable.  There was no good cause for the court to reveal the identity of the
28

juror considering that there was no evidence that the juror contact influenced the jury's ultimate decision.

Relatedly, petitioner claims that the trial court contravened state procedural rules when it failed to state its reasons for denial of his juror discovery request in the court's minute order. ECF No. 1 at 55. However, the trial court explained its reasons for its denial on the record during the hearing on the motion, stating that "the court does not find a compelling reason to release the information." ECF No. 20-10 at 4. The Court of Appeal found that, although the minute order was deficient under state rules, no reversible error occurred considering that the trial court stated its reasons on the record in open court. ECF No. 19-1 at 25-26. A "state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). Accordingly, we are bound by the Court of Appeal's finding and we recommend that petitioner's claim be denied.

### III.     Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing § 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, petitioner has not made a substantial showing of the denial of a constitutional right. Thus, we recommend that the court not issue a certificate of appealability.

**IV.     Findings and Recommendations**

The court should deny the petition for a writ of habeas corpus, ECF No. 1, and decline to issue a certificate of appealability.  These findings and recommendations are submitted to the U.S. District Court judge presiding over this case under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within 30 days of the service of the findings and recommendations, petitioner may file written objections to the findings and recommendations with the court and serve a copy on all parties.  That document must be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will then review the findings and recommendations under 28 U.S.C. § 636(b)(1)(C).

IT IS SO ORDERED.

Dated:    June 9, 2020                                           _____
                                                                                UNITED STATES MAGISTRATE JUDGE

No. 206.